UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA HENDER,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN DIRECTIONS WORKFORCE LLC; AMERICAN DIRECTIONS GROUP, INC.; and DOES 1 THROUGH 100, inclusive,<br><br>Defendants. | No. 2:19-cv-01951-KJM-DMC<br><br>ORDER |

Alexandra Hender ("plaintiff") brings this putative class action for several alleged California Labor Code violations. Defendants American Directions Workforce LLC and American Directions Group, Inc. (collectively "defendants") removed the case to this court. Not. of Removal ("NOR") ¶ 1, ECF No. 1. Plaintiff moves to remand to Shasta County Superior Court. Mot. to Remand ("Mot."), ECF No. 9. Defendants oppose the motion, Opp'n, ECF No. 14, and plaintiff has replied, Reply, ECF No. 16. As explained below, the court GRANTS plaintiff's motion to remand.

/////

/////

/////

1

## I. BACKGROUND

On July 23, 2019, plaintiff filed this putative class action in Shasta County Superior Court, making the following claims: (1) failure to pay overtime wages, California Labor Code §§ 510 and 1198; (2) meal period violations, *id.* §§ 226.7, 512(a); (3) rest break violations, *id.* §§ 226.7; (4) failure to pay minimum wages, *id.* §§ 1194, 1197, 1197.1; (5) failure to timely pay wages upon termination, *id.* §§ 201, 202; (6) failure to timely pay wages during employment; *id.* § 204; (7) wage statement penalties, *id.* § 226(a); (8) failure to keep payroll records, *id.* §§ 1174(d); (9) failure to reimburse business expenses, *id.* §§ 2800, 2802; and (10) unfair business practices, Cal. Bus. & Prof. Code § 17200. Mot. at 7.

On October 23, 2019, defendants removed the case to federal court, asserting jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d)(2)(A) and (d)(5) ("CAFA"). NOR ¶ 8. To support their contention that the amount in controversy exceeds the requisite $5 million under CAFA, defendants assess plaintiff's state court complaint. NOR ¶ 12. Plaintiff then moved to remand, challenging defendants' calculations. Mot. at 1. Defendants then submitted an opposition with additional evidence, Opp'n, and plaintiff has replied, Reply.

## II. LEGAL STANDARD

A defendant may remove to a federal district court "any civil action brought in a state court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). CAFA gives federal courts original jurisdiction over certain class actions only if (1) the class has more than 100 members, (2) any member of the class is diverse from the defendant, and (3) the amount in controversy exceeds $5 million, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2), (5)(B).

### A. CAFA

Congress enacted CAFA "specifically to permit a defendant to remove certain class or mass actions into federal court" and intended courts to interpret CAFA "expansively." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir 2015). As a general rule, courts "strictly construe the removal statute against removal jurisdiction" and apply a "strong presumption against removal," *Gaus v. Miles, Inc.*, 980 F.3d 564, 566 (9th Cir. 1992). However,

1   "no antiremoval presumption attends cases invoking CAFA," *Dart Cherokee Basin Operating
2   Co. v. Owens,* 574 U.S. 81, 89 (2014) (citing S. Rep. No. 109-14, p. 43 (2005) ("[CAFA's]
3   provisions should be read broadly with a strong preference that interstate class actions should be
4   heard in a federal court if properly removed by any defendant.")). Nonetheless, "[i]f at any time
5   before final judgment it appears that the district court lacks subject matter jurisdiction, the case
6   shall be remanded" to the state court. 28 U.S.C. § 1447(c).

   B. <u>Amount in Controversy</u>

    A defendant's burden of proof as to the amount in controversy for removal purposes initially is lenient. "A defendant seeking to remove a case from state to federal court must file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee,* 574 U.S. at 81 (quoting 28 U.S.C. § 1446(a)). The notice of removal "need not contain evidentiary submissions," rather a defendant's "plausible allegation that the amount in controversy exceeds the jurisdictional threshold" can suffice. *Id.* at 84, 89.

    When "a defendant's assertion of the amount in controversy is challenged . . . both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Id.* at 89. The parties may submit evidence outside the complaint including affidavits or declarations or other "summary-judgment-type evidence relevant to the amount in controversy at the time of removal." *Singer v. State Farm Mut. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997) (citation omitted). When the defendant relies on a chain of reasoning that includes assumptions to satisfy its burden of proof, the chain of reasoning and the underlying assumptions must be reasonable, and not constitute mere speculation and conjecture. *Ibarra*, 775 F.3d at 1197–99. "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure." *Id.* at 1198. Then "the district court must make findings of jurisdictional fact to which the preponderance standard applies." *Dart Cherokee*, 574 U.S. at 89 (internal citation and quotation marks omitted). If "the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Ibarra*, 775 F.3d at 1199.

III.     DISCUSSION

Plaintiff moves to remand based primarily on the amount in controversy requirement under CAFA. To determine the amount in controversy, the court looks first to the complaint. *Ibarra*, 775 F.3d at 1197. Generally, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) (footnote omitted). Here, plaintiff has brought a class action and alleges that the amount in controversy is less than $75,000.00. Compl. ¶ 1. Relying on the complaint, defendants' notice of removal evaluated the alleged waiting-time penalties, meal and rest break violations, wage statement penalties, overtime compensation, and potential attorneys' fees and argues the aggregated amount in controversy exceeds $5 million. NOR ¶¶ 11–18. Specifically, defendants estimate an amount in controversy of $18,062,172, discussed further below. *Id.*

In her motion to remand, plaintiff does not provide rebuttal evidence, aside from a declaration from her attorney detailing meet-and-confer efforts with defendants. Declaration of Taza Zabehi ("Zabehi Decl."), ECF No. 8-1; *see also* Reply at 5. Instead, she argues defendants do not meet their burden because they rely on unsupported assumptions. Mot. at 9–17; *see also* Reply at 5–10. Because plaintiffs challenge defendants' estimate, defendants bear the burden to establish jurisdiction by a preponderance of the evidence. *Dart Cherokee*, 574 U.S. at 86–88; *see also Ibarra*, 775 F.3d at 1197 (emphasizing "[party] seeking removal bears the burden to show by a preponderance of the evidence that the amount in controversy exceeds $5 million") (citation omitted). Accordingly, defendants must present more than a plausible case to show it satisfies the jurisdictional prerequisite, and the absence of plaintiffs' rebuttal evidence does not change that requirement.

In response to plaintiff's challenge, as noted, defendants submit additional evidence. *See* Declaration of Caroline Knox Burns ("Burns Decl."), ECF No. 14-1 (Chief Financial Officer of American Directions Core LLC, an affiliate of American Directions Workforce LLW); Declaration of Kate G. Hummel ("Hummel Decl."), ECF No. 14-2 (attorney for defendants who describes processes firm used to calculate script collecting payroll data). In her declaration, Ms. Burns avers, "[b]etween July 23, 2015 and July 23, 2019 (the 'Class Period'),

4

1  ADW employed approximately 1,782 individual non-exempt, hourly employees in the state of
2  California," whom ADW paid a minimum hourly rate of $12.00.  Burns Decl. ¶¶ 5, 13.  Of these
3  employees, 1,213 left their employment or had their employment terminated between July 23,
4  2016 and July 23, 2019.  *Id.* ¶ 12.  Defendants draw on these numbers to argue the total amount in
5  controversy is "at least $6,822,465 and could be over $18 million."  Opp'n at 17.

6  The question then is whether defendants have shown by a preponderance of the
7  evidence an amount in controversy of $5 million or more.  The court turns to this question,
8  considering each of plaintiff's claims below.

9      A.    <u>Waiting Time Penalties (Claim Five)</u>

10  Plaintiff alleges waiting time penalties under California Labor Code section 204,
11  which provides continued wages for "an employee not timely paid at the cessation of their
12  termination until paid or until suit is filed for a maximum of 30 days."  NOR ¶ 14 (citing Cal.
13  Labor Code § 204).  At the time of removal, defendants calculated a total amount in controversy
14  of $4,939,200, which they based on the following equation: 1,715 (the number of terminated
15  employees) x 8 (hours in workday) x 30 (assumed number of days after termination when
16  putative class members were not paid) x $12.00 (average hourly rate).  *Id.* (citing Compl. ¶ 25
17  ("Plaintiff and the other class members worked over eight (8) hours in a day, and/or forty (40)
18  hours in a week during their employment with Defendants.")).  This calculation sufficed under
19  the low burden of proof at the time of removal.  *See Dart Cherokee*, 135 S. Ct. at 551, 554
20  (defendant's "plausible allegation that the amount in controversy exceeds the jurisdictional
21  threshold" is enough; notice of removal "need not contain evidentiary submissions.").

22  Plaintiff argues defendants' calculations do not survive scrutiny for three reasons:
23  (1) defendants' "time period for the employees subject to waiting time penalties is overinclusive"
24  because it is based on an incorrect four-year statute of limitations; (2) defendants do not support
25  their calculation based on all putative class members working more than eight hours a day; and
26  (3) defendants' calculations are similar to those the Ninth Circuit rejected in *Lowdermilk v. U.S.*
27  *Bank Nat'l Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007) (applying "legal certainty" standard to
28  defendants who wrongly suggested all class members would "be entitled to the maximum

5

1  damages," when "many employees may have been paid only a few days late and, consequently,
2  would be entitled to fewer days of penalty wages."). Mot. at 11–13.

3  In response, defendants produce records showing 1,213 non-exempt employees
4  left ADW or were terminated by ADW between July 23, 2016 and July 23, 2019, based on a
5  three-year statute of limitations, as opposed to the incorrect four-year statute of limitations
6  defendants relied on in their notice of removal. Burns Decl. ¶ 12; *see also* Defs.' Ex. G (class
7  payroll download sorted by termination date). Defendants, assuming a 100 percent violation rate,
8  assert the amount in controversy for this claim would be $3,493,440.[1] Opp'n at 21. While there
9  are some flaws in plaintiff's position, the court ultimately finds plaintiff's first challenge to
10 defendants' calculations persuasive, as explained below.

11           1.       Eight Hours A Day?

12 Plaintiff incorrectly states her complaint does not allege all putative class members
13 worked more than eight hours a day, the very text plaintiff refers the court to shows otherwise.
14 *See* Compl. ¶ 25 ("Plaintiff and the other class members worked over eight (8) hours in a day,
15 and/or forty (40) hours in a week during their employment with defendants."). This suggests
16 defendants were correct to base their amount in controversy calculation on a 100 percent violation
17 rate. Additional allegations in plaintiff's complaint further support defendants' reasoning with
18 respect to the waiting time penalties claim. Compl. ¶ 93 ("During the relevant time period,
19 defendants intentionally and willfully failed to pay plaintiff and the other class members all
20 wages due to them, within any time period permissible under California Labor Code section
21 204.").

22 At the same time, the court must carefully assess the evidence defendants provide
23 in response to plaintiff's challenge. Plaintiff argues that defendants' records and pleadings show
24 she worked 186.7 hours total from January 8, 2018 to May 12, 2018; in other words, her daily
25 hours averaged well below eight hours, which calls into question whether each putative class
26 member would receive the $2,950 maximum statutory penalty. Reply at 8. Plaintiff further

---

[1] $12/hour X 8 hours/day X 30 days X 1,213 class members =$3,493,440.

6

argues that defendants' records reveal "that most employees did not work an average eight (8) hours per day" and "[d]efendants' use of '8 hrs/day' in their waiting time penalties calculation is therefore inflated." *Id.* at 9. The court agrees. Even a cursory overview of defendants' payroll records shows very few employees worked anywhere near 80 hours over a two-week period. *See* Defs.' Ex. A. The records for all the putative class members, as well as plaintiff's own hours, cast doubt on the accuracy of defendants' calculations of the amount in controversy.

The court is mindful that, "[t]he amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendants' liability." *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). Indeed, the court only analyzes the records and arguments here to understand what is "at stake" in this litigation, not "the likelihood that [plaintiff] will actually recover them." *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018). Through its independent evaluation, the court is persuaded by plaintiff's analysis that what is "at stake" in this case is far lower than what defendants suggest. Indeed, it is unlikely any of the putative class members would receive the maximum statutory penalty defendants calculate, assuming an 8-hour workday or a forty-hour workweek for every putative class member.

       2.   30-Day Maximum Statutory Penalty?

In considering plaintiff's argument based on *Lowdermilk*, the court notes the "legal certainty" standard articulated in that case no longer applies. *See Rodriguez v. AT&T Mobility Services, LLC*, 728 F.3d 975, 981 (9th Cir. 2013) ("The theory supporting our adoption of the legal certainty standard no longer holds true. *Lowdermilk*'s legal certainty standard is a consequence of a plaintiff's ability to plead to avoid federal jurisdiction. That principle is not viable in actions involving absent class members."); *Franz v. Beiersdorf, Inc.*, 745 F. App'x 47, 48 (9th Cir. 2018). Instead, under the Ninth Circuit's decision in *Arias*, defendants may "rely on a 'chain of reasoning' and 'assumptions' made from the complaint." *See* Opp'n at 23 (quoting *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019)). As defendants point out, since the panel's ruling in *Arias*, courts in this district have held defendants may rely on a complaint to assume a plaintiff could obtain a 30-day maximum statutory penalty. *See Nunes v.*

*Home Depot U.S.A., Inc.*, No. 2:19-CV-01207-JAM-DB, 2019 WL 4316903 at *3 (E.D. Cal. Sept. 12, 2019); *Gonzalez v. Comenity Capital Bank*, No. 1:19-CV-00342-AWI-EPG, 2019 WL 5304924 at *5 (E.D. Cal. Oct. 21, 2019).

Defendants rightfully assume, based on plaintiff's complaint, they should use a 30-day maximum statutory penalty to calculate the total amount-in-controversy for plaintiff's waiting time claim.  Plaintiff's arguments otherwise fail to account for the most recent precedent. However, defendants have not shown by a preponderance of the evidence that their calculations of the maximum statutory penalty, based on the average wages for putative class members, are correct.  As noted above, the evidence they provide in response to plaintiff's challenge does not show each putative class member worked 40 hours a week, and therefore on this record the average putative class member would not likely receive the maximum statutory penalty defendants calculate.

The reasoning and facts of *Nunes*, which defendants cite, further crystallize defendants' lapses here.  The defendants in *Nunes* relied on a declaration from an "experienced, privately-retained economist and statistical researcher" who discussed his "sources and methods" in his second declaration.  *Nunes*, 2019 WL 4316903, at *2.  The researcher used his "sources and methods" to calculate the "average daily wages" of all putative class members and then assumed a 100 percent violation rate to calculate the total amount in controversy for the waiting time claim.  *Id.* at 3.  Here, in contrast, defendants fail to provide an accurate basis for the numbers they say support their calculations.  Unlike the defendants in *Nunes*, they do not base their estimates on a researcher's calculation of "average daily wages."  With only their bare statement that each putative class member worked a full week and received $12 per hour, defendants have not established the amount in controversy for waiting time penalties by a preponderance of the evidence.  Therefore, the court does not consider defendants' estimate of waiting time penalties, $3,493,440, as part of the amount in controversy for CAFA purposes.

/////

/////

/////

B.    Meal and Rest Break Violations (Second Claim)

Plaintiff alleges defendants violated the California Labor Code's meal and rest period rules. At the removal stage, defendants calculated a total amount in controversy of $11,057,280 for these claims, which they reached by multiplying the number of members in the putative class per year by 5 (days per week putative class members worked) by 52 (weeks in the year) by $12 (average hourly rate). NOR ¶ 16. This calculation sufficed under the low burden of proof at the time of removal, when defendant needed to provide only a "short and plain statement." *Dart Cherokee*, 574 U.S. at 81 ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.") (internal citations omitted).

Plaintiff challenges defendants' calculations here for two reasons: (1) as with other claims, defendants have not supported their calculation here for the court to give it weight given that it is based on the assertion that all putative class members working over eight hours a day, five days a week, Mot. at 14–15; and (2) defendants do not support their 100 percent violation rate with any evidence, despite courts having found even a 20 percent violation rate is too speculative when "[n]owhere does [the declarant] address possible rate of meal-and rest-period violations, the number of complaints Defendant received regarding the lack of meal and rest periods, Defendant's policy addressing how meal and rest periods are scheduled[,]" *id.* at 15–16 (citing *Armstrong v. Ruan Transp. Corp.*, No. 2:16-CV-1143-VAP, 2016 WL 6267931 at *3 (C.D. Cal. Oct. 25, 2016)).

In response, defendants provide a more precise set of calculations: (1) a calculation based on the number of workweeks; and (2) a calculation based on the number of putative class members per year during the period at issue. Opp'n at 15–16. For each of these calculations, defendants include both a calculation based on a 20 percent violation rate and a calculation based on a 60 percent violation rate; in total, they provide four calculations of the amount in controversy for meal and rest break violations. *Id.* at 14–17. Defendants provide these calculations, based on different violation rates, as alternatives; they argue even if the court relies on the calculation

/////

9

1  resulting in the lowest amount in controversy, the total amount in controversy would exceed $5
2  million necessary for CAFA jurisdiction. *Id.* at 14–15.

3  In calculating the amount in controversy based on the number of workweeks,
4  defendants estimate an amount in controversy between $334,900 and $1,002,240 each for meal
5  and rest period violations. *Id.* at 15. To reach $334,900, which reflects a 20 percent violation
6  rate, defendants multiply $12 (the average hourly rate for putative class members) by 1 (missed
7  meal/rest period per workweek) by 27,840 (number of weeks worked by putative class during the
8  period at issue).[2] *Id.* (citing Burns Decl. ¶ 14; Hummel Decl. ¶ 4). To reach $1,002,240,
9  reflecting a 60 percent violation rate, defendants assume 3 missed meal/rest periods per
10 workweek.[3] *Id.* Based on the number of workweeks they say applies here, defendants calculate
11 an amount in controversy for meal and rest period violations collectively between $668,180[4] and
12 $2,004,480.[5] *Id.* at 16.

13 In calculating the putative members of the class per year, defendants reach an
14 amount in controversy between $1,101,360 and $3,304,080 each for meal and then rest period
15 violations. *Id.* Defendants have produced records showing 693 class members during the 2016-
16 2017 year, 677 class members during the 2017-2018 year, and 395 class members during the
17 2018-2019 year. *Id.* (citing Burns Decl. ¶¶ 9–11). To reach $1,101,360, reflecting a 20 percent
18 violation rate, defendants multiply $12 (the average hourly rate for putative class members) by 1
19 (day per week of violations) by 52 (weeks per year) by the number of class members per year[6]

---

[2] $12 X 1 X 27,840 = $334,090.

[3] $12 X 3 X 27,840 = $1,002,240.

[4] $334,090 + $334,090 = $668,180. Defendants calculate this total to be $668,160, Opp'n at 16; $668,180 is the correct calculation.

[5] $1,002,240 + $1,002,240 = $2,004,480.

[6] 2016-2017: $12 X 1 X 52 X 693 = $432,432.
2017-2018: $12 X 1 X 52 X 677 = $422,448.
2018-2019: $12 X 1 X 52 X 395 = $246,480.

and then add these yearly totals together.[7]  *Id.*  To reach $3,304,080, reflecting a 60 percent violation rate, similar to the corresponding calculation based on the number of workweeks, defendants assume 3 days per week of violations.[8]  When based on the number of putative class members per year, defendants calculate an amount in controversy for meal and rest period violations collectively between $2,202,720[9] and $6,608,160.[10]

Here, the evidence before the court supports defendants' calculations based on the putative class members per year and assuming a 20 percent violation rate.  In *Nunes*, a court in this district found that when a plaintiff claims a "policy and practice" of denying employees meal and rest breaks, defendants can reasonably assume a 20 percent violation rate.  *See Nunes*, 2019 WL 4316903, at *2.  As defendants point out, other courts through this circuit have also applied a 20 percent violation rate for purposes of calculating the amount in controversy for a meal and rest break claim.  *See* Opp'n at 17 (citations omitted).  Likewise, the court in *Nunes* relied on defendants' calculations based on total workweeks of putative class members.  *See Nunes*, 2019 WL 4316903, at *2.  Plaintiff's reliance on the *Armstrong* decision out of the Central District is unavailing.  If the court were to be persuaded by *Armstrong* and require defendants provide information regarding complaints related to meal and rest break periods, it would run afoul of the Ninth Circuit's ruling in *Arias*, overruling the district court's imposition of a requirement on defendants to "prove it actually violated the law at the assumed rate," when in fact "assumptions made part of the defendant's chain of reasoning need not be proven."  *Arias*, 936 F.3d at 927.

Plaintiff also claims the evidence defendants offer, namely pay period entries from their payroll system, is "antithetical to their conclusions" because the "'Total Hours' column of each page of Exhibit A of the Burns declaration indicates that a vast majority of putative class

---

[7] $432,432 + $422,448 + $246,480 = $1,101,360.

[8] $1,297,296 + $1,267,344 + $739,440 = $3,304,080.

[9] $1,101,360 + $1,101,360 = $2,202,720.

[10] $3,304,080 + $3,304,080 = $6,608,160.

1 members were not full-time employees." *Id.* at 8 (citing ECF No. 14-1, Ex. A) (emphasis in
2 original). Whether putative class members were full-time employees is irrelevant to this claim.
3 Unlike the waiting time penalties the court has reviewed above, meal and rest period violations
4 can occur with both full-time and part-time employees. *See* Cal. Lab. Code § 512(a) ("An
5 employer shall not employ an employee for a work period of more than five hours per day
6 without providing the employee with a meal period of not less than 30 minutes, except that if the
7 total work period per day of the employee is no more than six hours, the meal period may be
8 waived by mutual consent of both the employer and employee.").

9 In sum, the court considers defendants' estimate of meal and rest period penalties,
10 $1,101,360, as part of the amount in controversy for CAFA purposes.

11    C.    <u>Itemized Wage Statement Penalties (Claim Seven)</u>

12 Plaintiff also alleges defendants provided her and other putative class members
13 with inaccurate wage statements. At the time of removal, defendants estimated $407,100 in
14 controversy for the allegedly inaccurate wage statements. NOR ¶ 15. To get there, defendants
15 estimated the entire putative class received inaccurate wage statements and supported this
16 estimate with allegations from plaintiff's complaint. *Id.*; *see also* Compl. ¶ 97 ("Defendants have
17 intentionally and willfully failed to provide Plaintiff and the other class members with complete
18 and accurate wage statements."). Defendants also incorporated the $50 statutory fee for an initial
19 wage time penalty and $100 for all subsequent violations. *Id.* (citing Cal. Lab. Code § 226, which
20 "provides for a $50 penalty for the first pay period violation, and a $100 penalty for subsequent
21 violations."). The wage statement violation calculation sufficed for removal for the same reasons
22 as did defendants' calculations for overtime wages and meal and rest violations. *See Dart*
23 *Cherokee*, 574 U.S. at 81 ("short and plain" statement). In her motion, plaintiff argues defendants
24 have failed to provide the necessary evidence to "to suggest that every single wage statement for
25 every class member failed to state the accurate number of hours worked." Mot. at 14.
26 /////
27 /////
28 /////

12

Faced with plaintiff's challenge, defendants produce records showing "there were an average of 141 hourly research interviewers who received wage statements."[11] Opp'n at 24 (citing Burns Decl. ¶ 14 (detailing creation of a new subset of the Class Payroll Download showing all individual wage statements issued between July 23, 2018 and September 25, 2019)). To calculate the maximum penalty per employee, defendants multiply 1 by $50, which is the penalty for violations within the initial pay period, and then add $50 to 29 multiplied by $100, which is the penalty for subsequent wage violations, to reach an estimated maximum of $2,950 in penalties per employee. *Id.* at 23–24 (citing Cal. Lab. Code § 226, which "provides for a $50 penalty for the first pay period violation, and a $100 penalty for subsequent violations.")  Thus, defendants calculate a total amount in controversy for this claim as $415,950.[12] *Id.* at 24.

In response, plaintiff asserts defendants "provide no real evidence in their Opposition to justify the 100% wage statement violation rate." Reply at 9. As described above, plaintiff rejects defendants' "'reasonable assumption that class members suffered at least one violation of meal or rest break violations.'" *Id.* (quoting *Cavada v. Inter-Cont'l Hotels Grp., Inc.*, No. 2:19-CV-1675-GPC, 2019 WL 5677846 (S.D. Cal. Nov. 1, 2019)).  Indeed, plaintiff argues defendants' evidence "demonstrates that a 20% violation rate is unreasonable for both meal and rest break premiums" and "because one defective violation rate cannot serve as the foundation for another," the 100 percent violation rate for wage statement penalties is also unreasonable. *Id.*

Here, the court finds defendants have shown it is more likely than not that the amount in controversy for wage statement penalties is $415,950.  For the same reasons discussed above, the court finds defendants also have shown it is more likely than not that putative class members each suffered one meal and one rest period violation per week.  The court follows the decision in *Nunes*, in allowing calculations of meal and rest break violations based on a 20 percent violation rate, with each terminated class member missing one meal/rest break per week,

---

[11] 4,238 wage statements/ 30 pay periods between July 23, 2018 and September 25, 2019 = 141 wage statements per pay period.

[12] $2,950 X 141 employees per pay period = $415,950.

to serve as the basis for a calculation of wage statement penalties based on a 100 percent violation rate. *Nunes*, 2019 WL 4316903, at **2–3 (finding defendant's assumption of "one missed meal break and one missed rest break per week to be reasonable," while also finding "the terminated class members suffered at least one violation (e.g., one missed meal or rest break and were therefore not paid all wages owed upon termination.")).

Thus, the court considers defendants' estimate of wage statement penalties, $415,950, as part of the amount in controversy for CAFA purposes.

D. Overtime Compensation (Claim One)

Plaintiff also alleges defendants violated the California Labor Code's overtime compensation rules. At the removal stage, defendants calculated a total amount in controversy of $1,658,592 for this claim, which they reached by multiplying the number of members in the putative class per year by 1 (days per week putative class members worked overtime) by 52 (weeks in the year) by $18 (overtime hourly rate). NOR ¶ 17. As with its other initial calculations, this calculation sufficed under the low burden of proof at the time of removal, when defendant needed to provide only a "short and plain statement." *Dart Cherokee*, 574 U.S. at 81 ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.") (internal citations omitted).

Plaintiff challenges defendants' calculations here for two reasons, invoking similar arguments made with respect to other claims as well: (1) defendants do not show that every putative class member worked every week of the year, Mot. at 17; and (2) defendants do not provide any documentary evidence "to establish the propriety of their estimate [,]" Mot. at 17–18 (citing *Armstrong*, 2016 WL 6267931, at *3).

As with other calculations, defendants provide two separate calculations of the amount in controversy for overtime compensation claims—one based on the number of workweeks and one based on the number of putative class members per year during the period at issue. Opp'n at 18–21. Defendants also include both a calculation based on a 20 percent violation rate and a calculation based on a 40 percent violation rate, because district courts in California have found a 20 percent to 40 percent violation rate is reasonable when plaintiff alleges

a "'policy and practice' of failing to pay overtime[,]" *id.* at 18–19 (citing *Andrade v. Beacon Sales Acquisition, Inc.*, No. 2:19-CV-06963-CJC, 2019 WL 4855997 at *3 (C.D. Cal. Oct. 1, 2019) (additional citations omitted); in total, they provide four calculations of the amount in controversy for overtime compensation, *id.* at 18–21.

Defendants calculate the amount in controversy based on the number of workweeks as between $664,020 and $1,328,040. Opp'n at 19. To reach $664,020, which represents a 20 percent violation rate, defendants multiply $18 (overtime hourly wage) by 1 (day per workweek) by 36,890 (approximate total number of workweeks during the class period).[13] *Id.* (citing Burns Decl. ¶ 14, Hummel Decl. ¶ 3). To reach $1,328,040, reflecting a 40 percent violation rate, defendants assume 2 days per week of violations.[14] *Id.*

When calculating the amount in controversy based on the putative members of the class per year, defendants posit an amount in controversy between $2,339,062 and $4,678,128. *Id.* at 19–20 (citing Burns Decl. ¶¶ 8–11). Defendants have produced records showing 734 class members during the 2015-2016 year, 693 class members during the 2016-2017 year, 677 class members during the 2017-2018 year, and 395 class members during the 2018-2019 year. *Id.* To reach $2,339,062, reflecting a 20 percent violation rate, defendants multiply $18 (overtime hourly wage) by 1 (day per week of violations) by 52 (weeks per year) by the number of class members per year[15] and then add each of these yearly totals.[16] *Id.* To reach $4,678,128, reflecting a 40 percent violation rate, similar to the corresponding calculation based on the number of workweeks, defendants assume 2 days per week of violations.[17]

---

[13] $18 X 1 X 36,890 = $664,020.

[14] $18 X 2 X 36,890 = $1,328,040.

[15] 2015-2016: $18 X 1 X 52 X 734 = $687,024.
2016-2017: $18 X 1 X 52 X 693 = $648,648.
2017-2018: $18 X 1 X 52 X 677 = $633,672.
2018-2019: $18 X 1 X 52 X 395 = $369,720.

[16] $687,024 + $648,648 + $633,672 + $369,720 = $2,339,062.

[17] $1,374,048 + $1,297,296 + $1,267,344 + $739,440 = $4,678,128.

15

Plaintiff objects to these calculations and the evidence supporting them. In particular, plaintiff states the payroll information only provides the number of hours worked per pay period, which does not provide evidence of the number of shifts the putative class members worked or the length of those shifts. Reply at 9. The court notes these objections, but finds defendants have met their burden at this stage. As noted above, defendants need not provide information proving up their liability to demonstrate the amount in controversy, and such a requirement would contradict precedent. *Arias*, 936 F.3d at 927. Moreover, defendants have provided calculations based on a 20 percent violation rate, a conservative estimate allowing for the possibility that not every putative class member worked overtime. Other courts have approved, persuasively, a 20 percent violation rate when a plaintiff, as plaintiff does here, alleges a "pattern and practice" of defendants' failing to provide overtime compensation. *See Salazar v. PODS Enterprises, LLC*, No. 1:19-CV-260-MWF, 2019 WL 2023726, at *3–4 (C.D. Cal. 2019); *Kastler v. Oh My Green, Inc.*, No. 1:19-CV-02411-HSG, 2019 WL 5536198, at *4 (N.D. Cal. Oct. 25, 2019); *see also* Compl. ¶ 26. The court agrees with those courts and considers $2,339,062 as part of the amount in controversy for CAFA jurisdiction purposes.

E.  Attorney's Fees

For CAFA purposes, defendants combine their award estimates to form the baseline for their attorney's fees calculation. Opp'n at 25 (quoting *Arias*, 936 F.3d at 922 ("[W]hen a statute … provides for the recovery of attorneys' fees, prospective attorneys' fees must be including in the assessment of the amount in controversy.")). Applying the Ninth Circuit's 25 percent benchmark for reasonable attorney's fees in class action cases, defendants estimate plaintiff's attorney's fees between $1,310,392 and $3,798,919.[18] *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) ("The circuit has established 25% of the common fund as a benchmark award for attorney fees."). Plaintiff reasons that because defendants rely on

---

[18] $15,195,678 X .25 = $3,798,919.
$5,457,972 X .25 = $1,364,493. Defendants calculate attorneys' fees of $1,310,392.50 when the subtotal for the amount in controversy is $5,457,972, Opp'n at 26; $1,364,493 would be the correct calculation here, based on the 25 percent benchmark.

"unsupported assumptions" to calculate the amount-in-controversy, they "cannot make an accurate calculation of attorneys' fees." Reply at 10–11.

At this point, the court has found above that defendants have demonstrated only $3,856,372 as the estimated amount in controversy. Based on that, reasonable attorneys' fees using a 25 percent benchmark would be $964,093.

### F. Conclusion

As set forth above, the court finds defendants have shown by a preponderance of the evidence the amount in controversy is $4,820,465. This falls below the jurisdictional minimum of $5,000,000 for cases brought under CAFA. *See Gipson v. Champion Home Builders, Inc.*, No. 1:20-CV-00392-DAD-SKO, 2020 WL 4048503, at *10 (E.D. Cal. Jul. 20, 2020) ("As a result, defendant has shown by a preponderance of the evidence that the amount in controversy here is only $4,846,209.20, which is insufficient to establish that this court has jurisdiction over this action pursuant to CAFA."); *Castillo v. Trinity Services Group, Inc.*, No. 1:19-CV-01013-DAD-EPG, 2020 WL 3819415, at *8 (E.D. Cal. Jul. 8, 2020) (holding jurisdictional threshold is not met with amount in controversy of $4,821,139.20).

## IV. CONCLUSION

For the reasons the court describes above, the court GRANTS plaintiff's motion to REMAND to Shasta County Superior Court. This matter is remanded to Shasta County Superior Court, and the Clerk of Court here is directed to close this case.

IT IS SO ORDERED.

DATED: October 7, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE